## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

The Tapemark Company,

                Plaintiff/Counter-Defendant,

v.

E-Z Cleaners, LLC,

                Defendant/Counter-Plaintiff.

Civ. No. 10-813 (SRN/TNL)
**MEMORANDUM OPINION
AND ORDER**

Richard R. Voelbel, Donald G. Heeman, Randi J. Winter, Felhaber, Larson, Fenlon &
Vogt, P.A., Minneapolis, Minnesota, for Plaintiff/Counter-Defendant.

Graham M. Martin, Martin Legal Services, LLC, Minneapolis, Minnesota, for
Defendant/Counter-Plaintiff.

## INTRODUCTION

This case concerns small containers, called "Snap! units," manufactured by

Plaintiff The Tapemark Company ("Tapemark").  Tapemark alleges in this action that

Defendant E-Z Cleaners, LLC ("E-Z") breached a contract in which it agreed to purchase

10 million Snap! units for a total price of $530,000.  Presently before the Court are the

parties' cross-Motions for Summary Judgment.  For the reasons that follow, E-Z's

Motion will be denied and Tapemark's Motion will be granted in part.

## BACKGROUND

The relevant facts are undisputed.  Tapemark is a Minnesota company that

manufactures containers for the medical, cosmetic, and food industries (among others),

including Snap! units.  These containers are capable of dispensing a single dose of liquid or gel contents.  (Rensink Dep. at 12-14.)  E-Z is a North Carolina company that manufactures and sells cleaning and sanitation products, including hand sanitizer.  (See Martin Decl. Ex. 1; Seeman Aff. ¶ 3; Shafer Aff. ¶ 3.)

In April 2009, Tapemark and E-Z began discussing an arrangement whereby E-Z's hand sanitizer would be put into Snap! units and sold in retail chains.  (Seeman Aff. ¶ 7.) Several meetings and communications between the parties took place over the ensuing months; a production run of 10 million units was discussed, as was E-Z's request that Tapemark grant it exclusive rights to Snap! units for a three- to five-year period.  (Martin Decl. Exs. 2-6, 8; Seeman Dep. at 67-68.)  While Tapemark was "receptive" to some exclusivity (id.), the parties were unable to quickly come to an agreement on its terms or scope (such as geographic limitations and which retailers would be involved).  Moreover, in its communications between June 30, 2009 (the date of the face-to-face meeting) and early August 2009, E-Z sometimes mentioned exclusivity as a part of the parties' arrangement (see, e.g., Martin Decl. Ex. 9) and at other times did not (see, e.g., id. Ex. 7; Pl. Mem. Attachments 6-9).

On August 10, 2009, a few days after sending E-Z 1,000 sample Snap! units, Tapemark account representative Vamsee Venuturumilli e-mailed E-Z asking about the samples, inquiring about the "timeline" for the project, and requesting that E-Z fill out a credit application before production commenced, as Tapemark was "setting up E-Z . . . in

[its] system." (Martin Decl. Ex. 9.)[1] E-Z responded that it was "ready to proceed with the 10 million units" and that it was "looking to be in the marketplace with [Tapemark's] help in about 6-8 weeks." (Id.) The response also provided: "we need to have documentation of an exclusive." (Id.)[2] Venuturumilli responded later that day, acknowledging that Tapemark was ready to proceed with production and offering to "enquire regarding exclusivity aspects and . . . let [E-Z] know." (Pl. Mem. Attachment 12.) The response also advised that "[t]ypically, in our model – exclusivity will be tied to a narrow field of use, set time duration, and with volume commitments or exclusivity fee." (Id.)

In an e-mail the next day (August 11, 2009), Venuturumilli informed E-Z that after speaking with management, Tapemark was "willing to draft a[] short-term exclusivity agreement" for a one-year period, along with certain other parameters. (Martin Decl. Ex. 10.) "To maintain this exclusivity," the e-mail provided, E-Z would "need to buy at least 10 million units at a price of 5.3 cents every 3 months for the next 12 months." (Id.) He followed up on August 12 with another e-mail, offering to "draft a formal exclusivity agreement per the outline" sent the day before. (Id. Ex. 11.)

The following day, August 13, 2009, E-Z sent a purchase order to Tapemark for 10 million Snap! units at 5.3 cents each, split into two five-million-unit batches (for a price of $265,000 per batch). (Id. Ex. 13.) Besides the quantity and price per unit, no

---

[1] Tapemark had concerns about E-Z's creditworthiness and proposed either a large cash deposit before commencing production or splitting the 10-million unit order into smaller batches, with E-Z making a smaller deposit. (Shafer Aff. ¶ 5.)

[2] Reference to "*an* exclusive" and not "*the* exclusive" is a clear indication that an agreement regarding exclusivity was not in place at that time.

other terms or conditions were listed on the purchase order.  Tapemark then began

preparing to manufacture the units E-Z had ordered, and it advised E-Z of the same.  (Pl.

Mem. Attachment 18.)  Because of the size of the order and E-Z's lack of credit history,

however, Tapemark e-mailed E-Z on August 25, 2009, and proposed the following

payment structure:

> 1.  Issue a payment now for $150,000.  This allows us to buy all materials
> and tooling[;]
>
> 2.  Tapemark will run the first 5,000,000 parts and invoice end of Oct.
> (terms net 30)  Invoice amount will be approx. $115,000.  This is the
> difference between what you have already paid ($150,000) and the price of
> 5,000,000 parts. ($265,000)[; and]
>
> 3. Tapemark will run the balance of your order (5,000,000 parts) in January
> and bill upon completion the entire amount. ($265,000)[.] Due net 30.

(Id. Attachment 19.)

Meanwhile, the parties continued to discuss the terms of an exclusivity agreement.

Tapemark sent E-Z two drafts of such an agreement (id. Attachments 21, 25; Martin

Decl. Ex. 10), neither of which E-Z found acceptable because they provided exclusivity

for only a one-year period.  On August 26, 2009, Donna Seeman, E-Z's owner, e-mailed

Venuturumilli and suggested that the parties convene a conference call to discuss

exclusivity.  (Martin Decl. Ex. 14.)  The e-mail mentioned far broader exclusivity terms

than those proposed by Tapemark and maintained that Seeman and her father (who has a

managerial role at E-Z) had "discussed [E-Z's] intentions" regarding those terms when it

first met with Tapemark in June 2009.  Seeman also averred that "we thought this was

understood [and] [t]hat is why . . . all parties decided to go forward."  (Id.)  Venuturumilli

responded the following day, expressing concerns that E-Z's terms of exclusivity differed substantially from those he had proposed on August 11 and had vetted with Tapemark's management: "I am slightly worried that the latest email has a different outline, and *I know that it will be hard for Tapemark to honor it from a strategic standpoint.*" (Pl. Mem. Attachment 23 (emphasis added).)

On September 3, 2009, E-Z sent Tapemark a check for $50,000, which was a partial payment for the $150,000 deposit contemplated in Tapemark's August 25, 2009, proposal. (Martin Decl. Ex. 16.) Tapemark then informed its packaging manufacturer to produce sufficient materials for the first five-million-unit batch. (Shafer Aff. ¶ 6.) E-Z sent two additional $50,000 checks on October 9 and October 23, 2009, respectively, thus completing payment of the initial $150,000 deposit. (Martin Decl. Ex. 17.)

In the meantime, E-Z sent Tapemark an exclusivity agreement that had been drafted by its counsel, which was far more comprehensive than the ones sent by Tapemark in August 2009. (Seeman Dep. at 151-52; Martin Decl. Ex. 18.)[3] Tapemark did not immediately respond. Production of the first five-million-unit batch continued, however. Approximately one million units were produced and delivered to E-Z on October 21, and Tapemark sent E-Z an invoice for $53,185.50 for those units (to which the $150,000 deposit was applied, meaning nothing was owning at that juncture). (Shafer Aff. ¶ 8 & Ex. B.) Additional invoices were sent on October 22 (552,000 units for $29,256) and October 29 (1,702,500 units for $90,232.50). (Id. ¶ 8 & Exs. C-D.) By that

---

[3] The date this draft was sent to Tapemark is unclear from the record, but it appears to have been sent in early or mid-October.

point, the $150,000 deposit had been exhausted, leaving a balance of $22,674. Tapemark completed the batch of five million units on November 2, 2009, invoicing E-Z $86,655 for the last 1,635,000 units in the total. (Id. ¶ 8 & Ex. E.)[4] In sum, E-Z then owed Tapemark $109,329 for the initial five-million-unit batch ($22,674 + $86,655). It is undisputed that E-Z received and accepted the *entirety* of this batch and, in fact, re-sold approximately 3.5 million units thereof. Of the rest, some were lost in a fire, and E-Z believes it still possesses the remainder (approximately 1.2 million). (Seeman Dep. at 183-87.)

In November 2009, Tapemark contacted E-Z to find out when it would provide the sanitizer necessary to manufacture the second five-million-unit batch. (Martin Decl. Ex. 19.) On November 16, 2009, Seeman e-mailed Tapemark that E-Z was "prepared to ship [sanitizer] to you to arrive no later than Dec. 14th, but [E-Z's] lawyers are still waiting for [Tapemark] to respond to our [exclusivity] agreement. We need to have this taken care of." (Id.) Tapemark's Vice President, Kim Mueller, responded by e-mail on December 9; she did not address exclusivity, but instead inquired when Tapemark would receive the sanitizer necessary for the second batch and when it could expect payment for the first batch's outstanding invoices. (Id. Ex. 20.) Around that time (although the date is unclear from the record), in preparation for manufacturing the second batch of five million units, Tapemark informed its packaging supplier to begin producing the materials necessary for that second batch. (Shafer Aff. ¶ 9.)

---

[4] Tapemark manufactured slightly under five million units because it had not received enough sanitizer from E-Z to reach the full amount. (Shafer Aff. ¶ 8.)

Mueller and Seeman spoke by telephone on December 10.  (Martin Decl. Ex. 21.)
In that call Seeman again raised the issue of exclusivity, and Mueller informed her that
she (Mueller) would review the exclusivity agreement that had been drafted by E-Z's
lawyers.  (Id.)  She followed-up by email later that day, stating she was "hopeful that we
will come to mutually agreeable terms and move forward."  (Id. Ex. 22.)  The next day
(December 11), Mueller provided comments and substantial revisions to E-Z's draft
exclusivity agreement.  (Id.; Pl. Mem. Attachment 29.)  Seeman e-mailed Mueller on
December 15, advising her that she was "reviewing [Mueller's] edits," but "based on the
magnitude of this project and its impact," production would have to be delayed until mid-
February 2010.  (Pl. Mem. Attachment 31.)  Further telephone calls and e-mails were
exchanged between Mueller and Seeman (id. Attachments 32-33), but ultimately they
could not come to an agreement on exclusivity, and E-Z stopped doing business with
Tapemark.  The second batch of five million units was never produced.

Tapemark later demanded payment from E-Z for (1) $109,329, representing the
amount due from the first batch of five million Snap! units, and (2) $101,773.57, "for
Tapemark procured materials" for the second five-million-unit batch.  (Martin Decl. Ex.
23.)  No response came, and this action followed.  Tapemark asserts four claims in its
Complaint:  breach of contract (Count 1), account stated (Count 2), unjust enrichment
(Count 3), and breach of contract under the Uniform Commercial Code (Count 4).  E-Z
has counterclaimed for negligent and reckless misrepresentation, asserting that it would
not have sent the purchase order to Tapemark had it known Tapemark would not assent
to exclusivity on E-Z's terms.  Discovery is now complete, and the parties have cross-

moved for summary judgment.  The Court heard argument on the cross-Motions on

January 9, 2012, and they are now ripe for disposition.

## STANDARD OF REVIEW

Summary judgment is proper if, drawing all reasonable inferences in favor of the

nonmoving party, there is no genuine issue as to any material fact and the moving party is

entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett,

477 U.S. 317, 322-23 (1986).  The moving party bears the burden of showing that the

material facts in the case are undisputed.  Id. at 322; Whisenhunt v. Sw. Bell Tel., 573

F.3d 565, 568 (8th Cir. 2009).  The Court must view the evidence, and the inferences that

may be reasonably drawn from it, in the light most favorable to the nonmoving party.

Weitz Co., LLC v. Lloyd's of London, 574 F.3d 885, 892 (8th Cir. 2009); Carraher v.

Target Corp., 503 F.3d 714, 716 (8th Cir. 2007).  The nonmoving party may not rest on

mere allegations or denials, but must show through the presentation of admissible

evidence that specific facts exist creating a genuine issue for trial.  Anderson v. Liberty

Lobby, Inc., 477 U.S. 242, 256 (1986); Wingate v. Gage Cnty. Sch. Dist., No. 34, 528

F.3d 1074, 1078-79 (8th Cir. 2008).

Where, as here, the Court confronts cross-motions for summary judgment, this

approach is only slightly modified.  When considering the Tapemark's Motion, the Court

views the record in the light most favorable to E-Z, and when considering E-Z's Motion,

the Court views the record in the light most favorable to the Tapemark.  "Either way,

summary judgment is proper if the record demonstrates that there is no genuine issue as

to any material fact."  Seaworth v. Messerli, Civ. No. 09-3437, 2010 WL 3613821, at *3

(D. Minn. Sept. 7, 2010) (Kyle, J.), aff'd, No. 10-3532, 2011 WL 873121 (8th Cir. Mar.

15, 2011).

## ANALYSIS

### I.   Breach of contract

The core of Tapemark's case is breach of contract.  It has pleaded two such claims

in its Complaint:   one under Minnesota common law (Count 1), and the other under the

Uniform Commercial Code ("UCC"), as adopted in Minnesota (Count 4).  The Court

considers only the latter of these two claims, because the UCC governs all "transactions

in goods."  Minn. Stat. § 336.2-102.[5]  Indeed, both parties cite the UCC in their briefs.

(See, e.g., Def. Mem. in Supp. at 15; Pl. Mem. in Opp'n at 16.)

To prevail on a claim for breach of contract under the UCC, a plaintiff must prove

the following four "universal elements":  formation, performance, breach, and damages.

Dingxi Longhai Dairy, Ltd. v. Becwood Tech. Grp. L.L.C., 635 F.3d 1106, 1108 (8th Cir.

2011) (per curiam); U.S. Bank Nat'l Ass'n v. U.S. Rent a Car, Inc., Civ. No. 10-3900,

2011 WL 3648225, at *4 (D. Minn. Aug. 17, 2011) (Tunheim, J.).  "Formation," of

course, means the formation of an enforceable contract.  Typically this is shown through

evidence of an offer by one party that was accepted by the other.  See, e.g., SCI Minn.

Funeral Servs., Inc. v. Washburn-McReavy Funeral Corp., 795 N.W.2d 855, 864 (Minn.

2011) ("The formation of [a] sales contract[] requires mutual assent among the parties

---

[5] "Goods" are defined as "all things (including specially manufactured goods) which are movable at the time of . . . the contract for sale," Minn. Stat. § 336.2-105, and there can be no doubt that Snap! units fall within this definition.

involved in the transaction[, which] entails . . . [a]greement by both parties . . . in the form of offer and acceptance.").[6]

Under the UCC, "an order or other offer to buy goods for prompt or current shipment shall be construed as inviting acceptance either by the prompt promise to ship or by the prompt or current shipment of conforming or nonconforming goods."  Minn. Stat. § 336.2-206(1)(b).  E-Z's purchase order, therefore, "invited" Tapemark's acceptance through the prompt shipment of Snap! units filled with E-Z's sanitizer.  And that is precisely what occurred, as Tapemark manufactured, packaged, and shipped five million Snap! units to E-Z in October and November 2009.  Hence, there was an offer (E-Z's purchase order) that was accepted (by Tapemark shipping Snap! units), resulting in a contract.  See, e.g., Jesberg v. Baxter Healthcare Corp., Civ. No. 97-1062, 2006 WL 228872, at *3 (D. Minn. Jan. 30, 2006) (Magnuson, J.) ("A party can demonstrate his acceptance of an offer to buy goods by simply shipping the requested goods without objection.").

E-Z points out that UCC Section 2-206 contains the qualifying language, "[u]nless otherwise unambiguously indicated by the language or circumstances."  It argues that no contract was formed because it was understood by the parties, from the outset, "that strict exclusivity was a necessary part of any business deal between [them]."  (Def. Mem. in Opp'n at 11.)  The record does not support that contention, however.  As set forth above, only *some* of the parties' e-mails prior to August 13, 2009 – the date of the purchase

---

[6] Consideration also is required, e.g., Pine River State Bank v. Mettille, 333 N.W.2d 622, 626-27 (Minn. 1983), but consideration is not disputed here.

order – even mentioned exclusivity; many did not.  The purchase order itself was

incredibly sparse on details and said nothing about exclusivity, likely because that issue

was still being negotiated as of August 13, 2009.  More importantly, just days after

Venuturumilli informed E-Z that "it will be hard for Tapemark to honor [E-Z's proposed

exclusivity terms] from a strategic stand point," E-Z sent Tapemark a deposit for the

manufacture of the Snap! units.  Regardless of what E-Z may have *believed* about

exclusivity, neither "the language" of the purchase order nor the "circumstances"

surrounding the parties' transaction *unambiguously indicates* that a contract between

them was contingent on exclusivity.[7]

For this same reason, even if the purchase order had not been an offer accepted by

Tapemark's shipment of Snap! units, the Court would nonetheless find a contract here.

Under the UCC, "[c]onduct by both parties which recognizes the existence of a contract

is sufficient to establish a contract for sale although the writings of the parties do not

otherwise establish a contract."  Minn. Stat. § 336.2-207(3); see also Minn. Stat. § 336.2-

---

[7] At oral argument, E-Z directed the Court's attention to Minneapolis Cablesystems v. City of Minneapolis, 299 N.W.2d 121 (Minn. 1980), for the proposition that a contract cannot be formed when one party does not intend to be bound until certain future events (such as negotiating exclusivity) have occurred.  That proposition is well-settled under Minnesota law.  See also, e.g., Hansen v. Phillips Beverage Co., 487 N.W.2d 925, 927 (Minn. Ct. App. 1992); Wells Constr. Co. v. Goder Incinerator Co., 217 N.W. 112, 114 (Minn. 1927).  But "[a]n intent to be contractually bound is determined by the *objective* manifestations of the parties' words, conduct, and documents, and not by their subjective intent."  B.J. Johnson Partners, LLC v. Koss Paint & Wallpaper, Inc., No. A08-764, 2009 WL 911012, at *5 (Minn. Ct. App. Apr. 7, 2009) (emphasis added); accord, e.g., Holman Erection Co. v. Orville E. Madsen & Sons, Inc., 330 N.W.2d 693, 695 (Minn. 1983).  "Words are not the only medium of expression.  The conduct of the parties [must] be looked to since it often conveys as clearly as words a promise or an assent to a proposed promise."  Cut Price Super Markets v. Kingpin Foods, Inc., 98 N.W.2d 257, 268 (Minn. 1959).  Here, E-Z's conduct belies its claim that it did not intend to be bound without an agreement on exclusivity.

204(1).  Stated differently, "[a] manifestation of mutual assent may be inferred wholly or partly from . . . the conduct of the parties."  Hy-Vee Food Stores, Inc. v. Minn. Dep't of Health, 705 N.W.2d 181, 186 (Minn. 2005) (emphasis added) (quotation omitted).  E-Z not only accepted all of the Snap! units it received from Tapemark, without objection, but it re-sold the vast majority of them, all while continuing to negotiate the issue of exclusivity.  Under these circumstances, E-Z formed a contract to purchase 10 million Snap! units by manifesting its intent to be bound without exclusivity.

As a result of the foregoing, the Court determines that a valid contract was formed between the parties for the purchase of 10 million Snap! units.  In order to prevail on its contract claim, however, Tapemark also must show a breach of that contract and resulting damages.

The UCC requires a buyer to "pay at the contract rate for any goods accepted."  Minn. Stat. § 336.2-607(1); accord Minn. Stat. § 336.2-709 ("When the buyer fails to pay the price as it becomes due the seller may recover . . . the price . . . of goods accepted.").  There is no dispute that E-Z accepted, but did not pay for, all of the first batch of Snap! units produced by Tapemark (save for the $150,000 deposit).  Accordingly, at the agreed-upon rate of 5.3 cents per unit, Tapemark has been damaged in the amount of $109,329. (See Shafer Aff. ¶ 8 & Exs. B-E.)[8]

In addition, although Tapemark did not manufacture the second five-million-unit batch, it incurred costs of $101,773.57 preparing to do so, for which it has not been

---

[8] This is calculated as follows:  4,893,000 Snap! units at 5.3 cents each ($259,329), minus the deposit ($150,000).

reimbursed.  (Shafer Aff. ¶ 8.)  Such costs may be recovered as incidental damages.  See

Minn. Stat. § 336.2-710.  E-Z argues that Tapemark cannot recover these costs because

the $150,000 deposit (supposedly) covered "all materials and tooling" necessary to

produce *both* five-million-unit batches, quoting Tapemark's August 25, 2009 e-mail.

(Def. Mem. in Opp'n at 20-24.)  In other words, it argues that it has already paid these

production costs.  The Court does not agree.  At most, the e-mail indicates that Tapemark

*expected* the materials necessary to produce both batches would cost $150,000.  Nothing

in the record, however, contradicts Tapemark's evidence that the materials *actually* cost

more than that amount (Shafer Aff. ¶¶ 5, 8 & Exs. F-G) or suggests that such cost was

unreasonable.  See Minn. Stat. § 336.2-710 ("Incidental damages to an aggrieved seller

include any commercially reasonable charges, expenses or commissions incurred in

stopping delivery . . . or otherwise resulting from the breach.").[9]

Based on the foregoing, the Court determines that there are no genuine issues of

material fact and that Tapemark is entitled to summary judgment on its breach-of-

contract claim under the UCC (Count 4).  The Court further determines that Tapemark is

_____

[9] In any event, the Court agrees with Tapemark that E-Z has misconstrued the quoted language
from the August 25, 2009 e-mail.  The evidence indicates that the $150,000 deposit was intended
to secure a commitment from Tapemark's packaging supplier for a lower price on packaging
materials, not that it would actually *pay* for all of those materials.  (Shafer Aff. ¶ 5.)  Indeed,
Seeman confirmed this in her deposition.  (Seeman Dep. at 131 ("The *pricing* ultimately was
based on . . . do[ing] a deposit and then [] pay[ing] for it afterwards.").)  Further, Mueller
testified in her deposition that the purpose of the deposit was to "cover *an initial part* of the
expenses it'll take to get the project going."  (Mueller Dep. at 84 (emphasis added).)  And, when
the quoted portion of the e-mail is read together with the remainder thereof, it becomes clear that
the deposit was designed to cover costs for only the initial batch of Snap! units, not both batches.
(See Pl. Mem. Attachment 19 ("Tapemark will run the first 5,000,000 parts and invoice [E-Z].
[The] [i]nvoice amount will be approx. $115,000.  This is the difference between what you have
already paid ($150,000) and the price of 5,000,000 parts. ($265,000).").)

entitled to damages of $211,102.57 (comprising $109,329 for the first batch of Snap!

units and $101,773.57 for costs incurred preparing to produce the second batch).

## II.   The remaining claims

As noted above, Count 1 of the Complaint (common-law breach of contract) is

duplicative of Count 4 (breach under the UCC).  With summary judgment in Tapemark's

favor on Count 4, therefore, Count 1 is moot and will be dismissed.

As for the remaining claims, they, too, must now be dismissed as moot.  It is clear

from the Complaint that Counts 2 (account stated) and 3 (unjust enrichment) seek the

same damages as the breach-of-contract claim.  Double recovery for the same harm is

prohibited.  See, e.g., Wirig v. Kinney Shoe Corp., 461 N.W.2d 374, 379 (Minn. 1990);

Daum v. Planit Solutions, Inc., 619 F. Supp. 2d 652, 660 (D. Minn. 2009) (Kyle, J.).

Furthermore, neither a claim for account stated nor a claim for unjust enrichment may

stand when the plaintiff has prevailed on a breach-of-contract claim arising out of the

same transaction.  See, e.g., R.C. Smith Co. v. Commercial Env'ts, Inc., No. A11-363,

2011 WL 3795149, at *3 (Minn. Ct. App. Aug. 29, 2011) (noting that "a valid remedy at

law for breach of contract . . . precludes any relief under an equitable theory such as

unjust enrichment"); Wiltel Commc'ns, LLC v. Sunrise Int'l Leasing Corp., No. A04-

1054, 2005 WL 354030, at *3 (Minn. Ct. App. Feb. 15, 2005) ("The doctrine of account

stated is an alternative means of establishing liability for a debt *other than pursuant to a*

*contract claim*.") (emphasis added).  Accordingly, the remaining claims in Tapemark's

Complaint will be dismissed as moot.

III.    **The counterclaims**

Finally, the parties have moved for summary judgment on E-Z's fraudulent- and reckless-misrepresentation counterclaims.  The thrust of those counterclaims is that "representations by Tapemark [at the June 30, 2009 face-to-face meeting] about the scope of an exclusivity agreement were false."  (Counterclaims ¶ 10.)  The Court agrees with Tapemark that it is entitled to summary judgment on the Counterclaims because assuming *arguendo* that Tapemark misrepresented its intention to enter into an exclusivity agreement (or the scope thereof), E-Z cannot show it reasonably relied on those misrepresentations.

The record clearly establishes that before E-Z sent the purchase order to Tapemark, Venuturumilli expressly informed it that the exclusivity terms it sought would "be hard for Tapemark to honor . . . from a strategic standpoint."  (Pl. Mem. Attachment 23 (emphasis added).)  Subsequent correspondence further clarified that the terms of exclusivity being offered by Tapemark differed vastly from those allegedly "misrepresented" at the June 30, 2009 meeting.  (See, e.g., Martin Decl. Exs. 10-11.)  E-Z nevertheless elected to proceed, submitted the purchase order, made a $150,000 deposit, and accepted (and re-sold) millions of Snap! units shipped by Tapemark, all while still negotiating exclusivity terms.  Under these circumstances, the Court concludes that any purported "reliance" on Tapemark's "misrepresentations" about exclusivity at the June 30, 2009 meeting cannot have been reasonable or justifiable as a matter of law.  See, e.g., Dank v. Betcher, Nos. A05-99, A05-540, 2005 WL 3527217, at *5 (Minn. Ct. App. Dec. 27, 2005) ("Justifiable reliance is a required element of a claim for intentional or reckless

fraud and misrepresentation."); <u>Flynn v. Am. Home Prods. Corp.</u>, 627 N.W.2d 342, 350-51 (Minn. Ct. App. 2001) (claim for negligent misrepresentation requires showing of reasonable reliance).

## CONCLUSION

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS ORDERED** that E-Z's Motion for Summary Judgment (Doc. No. 45) is **DENIED** and Tapemark's Motion for Summary Judgment (Doc. No. 38) is **GRANTED IN PART**. Tapemark's Motion is **GRANTED** with respect to Count 4 of the Complaint (Doc. No. 1), and Tapemark shall recover of E-Z the sum of $211,102.57 for breach of contract. The remaining claims in the Complaint (Counts 1-3) are **DISMISSED** as moot. Tapemark's Motion is further **GRANTED** as to E-Z's Counterclaims (Doc. No. 5), which are **DISMISSED WITH PREJUDICE**.

Judgment shall be entered in favor of the Tapemark Company and against E-Z Cleaners, LLC in the amount of $211,102.57.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**


Dated:  January 25, 2012                         s/Richard H. Kyle
                                                 RICHARD H. KYLE
                                                 United States District Judge